————O————

HENRY S. TURNER, Appellant, *vs.* LEVIN H. BAKER, *et al.,* Respondents.

1. *Land and land titles—Unascertained boundaries—Agreement as to mode of establishing—Ejectment—Statute of frauds, etc.*—When the proprietors of contiguous estates, the boundaries of which are indefinite and unascertained, agree upon the line dividing their estates, the calls in their respective deeds fasten themselves upon the property to which they are thus applied, and the title passed by the conveyances covers and includes every part of the property so identified as being comprehended within the description contained in the grant. Such boundary, thus agreed upon, is to be considered the true one, and each proprietor becomes the legal owner of the land called for in his deed, up to such boundary. Such agreements are not within the statute of frauds, and ejectment may be maintained for all the land included within the calls of the deed, as located and determined by the agreement of the parties fixing the boundary.

2. *Lands and land titles—Coterminous proprietors—Dividing line, parol agreement changing location of—Statute of frauds.*—When the location of the true boundary dividing their estates is known to the coterminous proprietors and they attempt, for mutual convenience, or other sufficient reason, to transfer

land from one to the other, by a parol agreement changing the location of such boundary, the statute of frauds will inflexibly apply.

3. *Boundary line, long acquiescence in agreement as to line may be inferred from when.*—Long acquiescence in the location of a boundary line, together with the acts and declarations of the parties treating the same as the true boundary, will authorize a jury to infer an agreement, between the parties, establishing such boundary.

4. *Forcible entry and detainer—Final judgment in—Relation, doctrine of.*—If A. being the true owner of a tract of land be disseized, and B., in an action of forcible entry and detainer against the disseizor, recover judgment against him, such judgment even when executed by a writ *habere facias possessionem,* will not relate to the institution of the suit so as to make the adverse possession of the disseizor, during the intervening time, the adverse possession of B. as against A. When premises are wholly vacant, the adverse possession follows the true title.

5. *Practice civil—Adverse possession—Instruction as to improper, when.*—An instruction is improper which leaves to the jury to determine the question what acts of ownership will amount to adverse possession.

6. *Ejectment brought in* 1856—*Petition sworn to, evidence of what.*—In 1856 a petition in ejectment being required to be sworn to amounted to a solemn admission that plaintiff at date of suit was out of possession.

*Appeal from St. Louis Circuit Court.*

*Glover & Shepley,* for Appellant.

The evidence is conclusive, 1st, that the line was located at Lindell's west fence and lived up to from 1824 to 1845; 2nd, that Lindells were put in possession in 1852 and down possibly to 1855; 3rd, that in 1856 Lindell's people were out of possession, and Lucas' people in possession, and the Lindells commenced suit for whole vacant space; sued McLaughlin on the south, and Hannegan on the north side Washington Ave., they being adverse occupants. These facts entitle the plaintiff, who sued January 7, 1865, to a recovery.

The location of the line by the agreement and acquiescence of the parties was conclusive as to the title. (12 Wend. 130; Jackson vs. McConnell, Id. 422; Rockwell vs. Adams, 7 Cow. 762; 6 Wend. 469; 13 Wend. 539; 7 Johns R. 238; Lindell vs. McLaughlin, 30 Mo. 28; Taylor vs. Zepp, 14 Mo. 482; Chouteau vs. Goddin, 39 Mo. 250; Rutherford vs. Tracy, 48 Mo. 325; Dolse vs. Vodicka 49 Mo. 98; Finnegan vs. Canahan, 6 Barb. 257; Garnhart vs. Finney, 40 Barb. 449; Allen vs. Sales, 56 Mo. 29.)

Defendant's instruction No. 14 was erroneous. If no one was in actual possession, Lucas' representatives would be in constructive possession up to the located line. (Griffith vs. Schwenderman, 27 Mo. 412; City vs. Gorman, 29 Mo. 603; Miller vs. Shaw, 7 Id. 129; Barr vs. Graty, 4 Wheat. 224; Wells vs. Prince, 4 Mass. 65; Harrison vs. Cachelin, 23 Mo. 124; S. C. 35 Mo. 177.)

This instruction does not proceed upon the idea of a possession of part, and acts of ownership over the whole, but of acts of ownership by one out of possession.

The representatives of Lucas owned the land up to Lindell's west fence in 1854, their line having been fixed up to that fence, and when they entered and fenced it, it was vacant. Lindell's tenants were gone. Is it possible the Lindells could not abandon possession? That Lucas' representatives who owned the land could not enter upon their land and enjoy it? If not, who could? Could the Lindells who had no right west of their fence, and who would be trespassers beyond that line? (See 3 Blacks. 175; Henderson vs. Griffin, 5 Peters, 158; McIver vs. Regan, 1 Cooke, 366.) The possession of the Hannegans', by the consent of Lucas' representatives, made them their tenants. (See also Henman vs. Cranmer, 9 Barr, 40; Hard vs. Bodley, 5 Lit. 88; Taylor vs. Shields, 5 Lit. 295; 3 Wash C. C. 475-479.)

Henry L. Patterson and Wm. Fulton appeared in the suit the Lindells commenced against Hannegan in 1856, and were allowed to defend. This admitted Patterson and Fulton in possession of the whole tract sued for. Of course the Lindells were out of possession. (Doe vs. Brennan, 2 Dev. 174; Pope vs. Buckner, 1 B. Mon. 163; Bufort vs. Gaines, 6 J. J. Marsh. 39; Troublesome vs. Estill, 1 Bibb. 129.) The possession of Patterson and Fulton was hostile to Lindell's, not hostile to Lucas' representatives, Moore & Turner.

Defendant's instruction No. 15 was erroneous. It confounds the location of the line with the bar by limitation. The defense of limitation is wholly different. It concedes the want of title and relies on possession subsequent to the location of the line. But in this instruction the court says that no estoppel could be

made out without such possession as would bar the cause of action.

The court erred in rejecting the record of the suit which the Lindells commenced February 19, 1856, to recover possession of the land in dispute from John Hannegan. It was offered to show that the Lindells at the date of that suit were not in possession of any of the land in dispute ; that they admitted they were out of possession; that one of them swore that the plaintiffs were not in possession.

*B. A. Hill*, for Respondents.

I. The court below erred in giving the instructions asked by the plaintiff and given by the court of its own motion. The doctrine of estoppel does not depend upon the proposition stated in the instructions given for the plaintiff, but is better stated in those asked by the defendant and refused by the court.

To raise an estoppel so as to pass title to real estate from the Lindells to Lucas, there must have been an express design on the part of the Lindells that their acts or statements should influence the actions of Lucas, and they must have had a knowledge of the facts. The right of the Lindells and their heirs to the land can be lost or forfeited only by such conduct as would make it fraudulent and against conscience to assert it. (Combs vs. Cooper, 5 Minn. 254, presenting a learned review of the doctrine of estoppel *in pais;* Commonwealth vs. Moltz, 10 Barr, 530, 1, in point; Gavish vs. Proprietors of Union Wharf, 26 Me. [13 Shep.] 384, 393 ; Andrews vs. Lyons, 11 Allen, [Mass.] 349 ; Cumming's adm'r vs. Webster, 43 Me. 192 ; Rangely vs. Spring, 21 Me. 130 ; Wallace vs. Truesdale, 6 Pick. 445 ; Welland Canal Co. vs. Hathaway, 8 Wend. 430 ; Taylor vs. Ely, 25 Conn. 250 ; Preston vs. Mann, Id. 118 ; Copeland vs. Copeland, 28 Me. 525; Pickford vs. Sears, 6 Ad. & El. 469; see also Sullivan vs. Parks, 33 Me. 438 ; Witcher vs. Williams, 20 Conn. 98 ; Dyer vs. Coy, Id. 568 ; Steele vs. Putney, 3 Shep. 327; Strong vs. Ellsworth, 26 Verm. 367 ; Worrel vs. Lathrop, 30 Id. 307 ; McAfferty vs. Connover, 7 Ohio, N. S. 99 ; Lawrence vs. Brown,

1 Seld. 394; Taylor & Mason vs. Zepp, 14 Mo. 482; Jewett vs. Miller, 10 N. Y. 402.)

There is no evidence in this case that the Lindells ever made any declaration, or did any act, to induce Lucas to purchase the two arpents of land of O'Fallon, or to locate them upon the vacant space. It is manifest that neither the Lindells or Lucas ever knew anything in regard to the true boundary of their lands until 1845, when the Lindells had a survey made of the two by forty arpents. Then both parties ascertained their true lines, and the Lindells asserted their title and James H. Lucas would not assert his, but permitted the Finneys to possess until 1849, when they acquired title by the statute of limitations to Lucas' land.

The instructions for plaintiff are grossly erroneous, in making statements not shown by the evidence. (Miller vs. Platt, 5 Duer, N. Y. 272; Titus vs. Morse, 40 Maine, 348; Parker vs. Barker, 2 Met. 421; Richardson vs. Chickering, 41 N. Hamp. 380; Odin vs. Gove, Id. 465; Boggs vs. Wersel, 14 Cal. 279; Field, C. J. Id; Califf vs. Hillhouse, 3 Minn. 311.)

"Acquiescence in an erroneous line, and in an adverse possession in accordance therewith, is no bar to a recovery, unless continued so long that the statute of limitations attaches." (Jackson vs. McConnell, 19 Wend. 175; Brewer vs. Boston & Worcester Railroad Co., 5 Met. 478; Talman vs. Sparhawk, Id. 469.)

There is not a single element of estoppel in this case. The whole scheme of the plaintiff rests upon this hypothesis, viz: That O'Fallon thought Fry's fence was his west line; that he told Lucas so, and innocently *deceived him;* that Lucas and O'Fallon told the Finneys so, and located them on Lucas' land; that the Finneys enclosed so as to hold by actual possession from 1829 until this day; that Lucas did not enclose the land of the Lindells, which he erroneously supposed belonged to him; that the Finney fence remained from 1829 to 1845, a period of sixteen years, before the Lindells and Lucas discovered the true lines of the tracts described in the deeds under which the

parties claimed title ; that the Lindells then asserted their title according to their deeds, and recovered the land up to Finney's fence in October, 1852, and entered into possession, and have held the lot ever since by actual possession of their tenants.

I have not been able· to find a case in the books, where a plaintiff has sought to recover land in ejectment upon an *estoppel in pais*, from a defendant holding the true title by deed and the possession to support it.

When the Lindells commenced their suit against the trespassers, in 1845, for all their land, up to Finney's fence, Lucas was bound to assert his rights against the Finneys, and his negligence in doing so until 1849, gives him no claim against the Lindells.

II.   The rule is well settled, that one who is not bound by estoppel cannot take advantage of an estoppel. (Lansing vs. Montgomery, 2 Johns. 382 ; 8 Wend. 480 ; Dezell vs. Odell, 3 Hill, 221 ; Jewett vs. Miller, 10 N. Y., 6 Seld. 402 ; Griffin vs. Richardson, 11 Iredell, 439 ; The Cohoes Co. vs. Goss, 13 Barb. 137 ; Hoffner vs. Noble, 11 Ill. 531 ; Wright vs. Hazen, 24 Verm. 143.)

There is no mutuality in this case between the Lindells and Lucas or their heirs.   Lucas did not claim in any way under the Lindells, made no agreement with them, and did no act to fix a boundary line for them.   If the Lindells, in 1827, had enclosed the Lucas land in the western half of the tract, and had held it for any period short of twenty years, they could have been ejected by Lucas ; and there being no agreement between the parties in regard to the line or fence, the Lindells could not have claimed the benefit of an estoppel as against Lucas.

Lucas was bound to know his own lines, and the Lindells were under no obligation to fix them for him.   But neither of the parties knew their true lines, and no representations were made on either side, and there can be no estoppel.

III.   It has been held in many cases that the statute of frauds stood in the way of allowing the title to real estate to be affected by parol evidence at law, in regard to boundaries agreed upon without writing, and that relief could only be granted in a court of equity whenever the circumstances were such as to show

actual fraud. (Parker vs. Barker, 2 Met. 421 ; Marshall vs. Pierce, 12 N. H. 127 ; The Mayor vs. Bolling, 3 Rand. 563 ; Denn vs. Baldwin, 1 Zabriskie, 395 ; Swick vs. Sears, 1 Hill, 18 ; Delaplaine vs. Hitchcock, 6 Hill, 17 ; McPherson vs. Walters, 16 Ala. 714 ; Day vs. Rowland, 17 Id. 681 ; 18 Id. 182 ; Walker vs. Murphy, 34 Id. 501.)

The weight of authority is now in favor of allowing an estoppel *in pais* arising from *fraud, concealment* or *misrepresentation* of title to land *to constitute a good defense in a court of law*. (Sayles vs. Smith, 12 Wend. 67 ; and cases cited in 2d vol. Smith's Leading Cases, ed. of 1866, p. 761.) But no authority can be found authorizing a party to sue the real owner at law, who is in possession of his land according to his deeds, and recover upon such an estoppel *in pais*, in ejectment or other form of real action. Such a case has never been heard of as this. It is said the Lindells did not assert their title and possession of this vacant space from the building of Finneys' fence in 1829 until 1845, a period of sixteen years ; but they asserted their title and possession by an action of forcible entry and detainer, commenced in August, 1845, against trespassers, in which suit they recovered judgment, had execution, and were put into possession by the sheriff in October, 1852, and have continued in possession of the lot in suit ever since. The judgment and execution relate back to the commencement of the suit, and transfer the possession as of August, 1845, so that the Lindells and their heirs have had possession of the property in suit, and asserted claim to it, for twenty years prior to plaintiff's action of ejectment now pending.

In every case cited in the books concerning the operation of an estoppel *in pais*, upon titles to real estate in ejectment, the party setting up the estoppel has been *in possession* and has invoked the equitable rule to defend his possession in an action at law.

Lucas never had any actual possessions of the vacant space prior to October, 1852 ; and although the Lindells' fence did not extend to the western limit of their tract, they held possession by construction of law of the whole tract described in their deeds, not in the actual adverse possession of other persons. (2d ed. Ang.

Lim., § 400, and cases cited ; Elliot vs. Pearl, 10 Peters, 412, &c.)

IV: Where both parties knew the facts, or have the same means of knowledge, neither can have any claim to equitable relief against the other. (Comm. vs. Naulty, 10 Barr, 527, 531 ; Crest vs. Jack, 3 Watts, 238.)

In this case neither party knew the facts, and each party had the same means of knowledge, by procuring a survey to be made of the whole tract. The Lindells ascertained the truth of the matter in 1845, and promptly acted upon it, and Lucas would not act and did not claim possession then. There can be no estoppel *in pais* under the facts of this case to authorize a court to oust the real owner from his possession. (Parker vs. Barker, 2 Metc. 451 ; Talman vs. Sparhawk, 5 Metc. 469 ; Titus vs. Morse, 40 Maine, 348.)

It does not aid the claim of plaintiff that Lucas put the Finneys into possession of his land in 1829, without consulting the Lindells. If Lucas gave his land to the Finneys, and they improved it, it does not follow in law or in morals that the Lindells should surrender a part of their land to Lucas, unless some agreement to that effect can be shown.

The verbal declarations of the Lindells to persons having no interest in the land in suit have no effect upon the questions at issue. (Sullivan vs. Park, 33 Maine, 438 ; Quin vs. Brady, 8 Watts & S. 139 ; Medley vs. Williams, 7 Gill. & Johns. 31 ; Hamlin vs. Hamlin, 1 App. 141, and cases cited.)

V. The case of Lindell vs. McLaughlin, (30 Mo. 29,) has no bearing on this case. The facts assumed by the court in that case are not supported by the proof in this case, and the doctrine of equitable estoppel *in pais* in that case was declared upon a supposed acquiescence of the Lindells in the claim, acts of ownership and possession of Lucas for thirty years ; and Lucas being in possession of a lot in the south arpent when suit was brought, the court held that the estoppel upon the assumed facts might operate to bar the action of ejectment. The case now presented is wholly different in all its material features. (See further

and generally as applicable to appellant's case, Davis vs. Davis ; 26 Cal. p. 38–9, in point fully ; Corkhill vs. Landers, 44 Barb. 227–8, in point ; Wright vs. Douglass, 10 Id. 97, in point ; Griffith vs. Beecher, 10 Id. 432, in point ; Hazelton vs. Batchelder, 44 N. H. 42 ; Califf vs. Hillhouse, 3 Min. 311, in point fully ; Piper vs. Gilmore, 49 Maine, 153, in point ; Vasberg vs. Teater, 32 N. Y. 568, in point ; Terry vs. Chandler, 16 N. Y. 354, 367, in point ; Adams vs. Rockwell, 16 Wend. 285, in point ; Danforth vs. Adams, 29 Conn. 107 ; Taylor vs. Ely, 25 Conn. 250 ; Preston vs. Mann, Id. 118 ; see also Smith's Lead. Cas., ed. of 1856, top p. 759–769.)

In the case of Turner vs. Baker, (42 Mo. 15) this court, decided and showed clearly that there was no estoppel *in pais* in this case ; that there was no evidence in the case to warrant it— that the Lindells had the possession from the 22d of October, 1852.

That decision of this court disposes of the case now presented upon the same facts.

Since that decision the plaintiff has introduced testimony showing that Patterson under Lucas, in 1854, took possession, and put Hannegan into the possession of the lot west of Turner's lot, and fenced the lot so as to leave about sixty feet of Turner's lot, now claimed by him, east of the Hannegan lot as fenced in by Patterson and his carpenter, Wm. Fulton. The Turner lot now sued for, was not fenced in by Patterson, except to the extent of ten or fifteen feet on the west end of the 75 feet claimed by Turner, under his deed from Mrs. Hunt, the daughter of Lucas. Defendants, since 1854, have been in actual possession of the lot sued for. Defendants also have a title to the whole lot sued for by a tax deed of 1866 or 1867 under the new tax law. See tax deed of State to B. A. Hill.

On the doctrine of estoppel as applicable to this case counsel further cited : Martin vs. Zellerbach, 38 Cal. 315 (1859) ; see also Simpson vs. Pearson, (1869) 31 Ind. 1 ; McKenzie vs. Steele, 18 Ohio St., 38 (1868) ; Donaldson vs. Hall, 2 Daly, [N. Y.] 325 ; State vs. Pepper, 31 Ind. 76 (1869) ; Voorhies vs. Henshaw, 30 Id. 488 (1868) ; Lewis vs. Haywood, 64 N. C. 83 ;

Barker vs. Bell, 37 Ala. 359, 18 Id. 182 ; McPherson vs. Walters, 16 Ala. 714; 34 Id. 591 ; Corkhill vs. Lander, 44 Barb. 218 ; Rangely vs. Spring, 28 Me. 127 ; Warner vs. Fountain, 28 Wis. 412, a case in point; Junction R. R. vs. Warpold, 19 Ind. 350 ; Leland vs. Gasset, 17 Vt. 403 ; Wilson vs. Harwood, 23 Me. 131 ; Batchelder vs. Sanborn, 4 N. H. 474 ; Moore vs. Moore, 11 Humph. 433 ; Boggs vs. Merced Co., 14 Cal. 279 ; Woods vs. Wilson, 37 Penn. 379 ; McCracken vs. City San Francisco, 16 Cal. 626 ; Davis vs. Davis, 26 Cal. 41 ; Tilden vs. West, 8 Ired 83 ; Royston vs. Hourie, 15 Ala. 309 ; Dixfield vs. Newton, 41 Me. 221 ; Taylor vs. Ely, 25 Conn. 250 ; McGarrity vs. Byington, 12 Cal. 426 ; Odlin vs. Gale, 41 N. Y. 465 ; McCafferty vs. Connover, 7 Ohio St. 99 ; Bowman vs. Cudworth, 31 Cal. 153 ; Carpenter vs. Stilwell, 11 N. Y. 61; Darlington's Appeal, 37 Penn. St. 430 ; Carpenter vs. Thurston, 24 Cal. 283 ; Knowlton vs. Smith, 36 Mo. 512 ; St. Louis University vs. McCune, 28 Mo. 484 ; Thomas vs. Babb, 45 Mo. 384 ; Dolde vs. Vodica, 49 Mo. 98 ; Adams vs. Rockwell, 16 Wend. 302, 303 ; Baldwin vs. Brown, 16 N. Y. 359; Reed vs. Farr, 35 N. Y. 113 ; Knowlton vs. Smith, 36 Mo. 507 ; 3 Washb. Real. Prop. 491–500 ; Barker vs. Bell, 37 Ala. 359 ; 18 Ala. 182 ; McPherson vs. Walter, 16 Ala. 714 ; 34 Ala. 591.

HOUGH, Judge, delivered the opinion of the court.

This was an action of ejectment, brought by the plaintiff against the defendant, in January, 1865, to recover possession of a lot of ground in the city of St. Louis, being part of what was known as the Clamorgan field lot, in the St. Louis common fields, and lying between Thirteenth and Fourteenth streets, on the north side of Washington avenue, with a front of seventy-five feet on said avenue, and a depth of one hundred and fifty feet.

The defendants pleaded not guilty and the statute of limitations.

This case was before this court on a former occasion, and the decision then rendered will be found reported in 42 Mo., 13. The case is one of disputed boundary, and the controversy grows out of the following facts :

In the year 1821, Jeremiah Connor was the owner of a tract of land supposed to be forty arpents in length from east to west, and one in depth, which was confirmed to one Clamorgan ; also another tract of the same dimensions adjoining it on the south, confirmed to one Bissonet, the two making, when taken together, a tract of 2x40 arpents.

On the 20th day of October, 1823, John O'Fallon bought of Connor, through the sheriff, the west half of the entire tract of 2x40 arpents.

On the 1st day of November, 1823, Peter and Jesse G. Lindell bought of Connor, through the sheriff, all that portion of the Clamorgan arpents lying west of Eleventh street, and bounded on the west by the tract bought by O'Fallon, being about 1,100 feet in length, east and west, and supposed to contain between five and six arpents.

On the 29th day of June, 1824, Jacob Fry bought of Connor, through the sheriff, all that portion of the Bissonet arpents lying west of Eleventh street, and bounded on the west by the tract purchased by O'Fallon, and on the north by the tract purchased by P. and J. G. Lindell.

The evidence tends to show that the tract purchased by Fry was surveyed and staked off before it was sold, and a stone set up at his southwest corner.   This point was ascertained to be on the western line of Fry's purchase by marking off twenty arpents from the eastern extremity of the tract, it being supposed at that time that the entire tract was only forty arpents long.   Fry immediately erected a fence on his western line thus ascertained, and that line was then and for a long time afterwards considered the center line of the 2x40 arpents.

On October 13, 1824, O'Fallon sold and conveyed to J. B. C. Lucas 1x2 arpents, that is, one arpent in the Clamorgan tract and one arpent immediately south of it on the Bissonet tract, the two being bounded on the east by the tracts purchased of Connor by P. and J. G. Lindell and Jacob Fry.   The Fry tract was then enclosed and O'Fallon sold to Lucas by Fry's fence as his eastern boundary.

Fry died in 1824, and on the 8th day of May, 1827, the Lindells purchased of Fry's administrator, the tract purchased by Fry of Connor.

In 1828 or 1829, the Lindells fenced what they supposed to be the ground purchased by them of Connor, by continuing the Fry fence northward and enclosing the north line of the Clamorgan tract.

In 1827 or 1829, O'Fallon sold to John and William Finney ten arpents in the west half of this 2x40 arpents, bounding the tract, so sold, on the east by the two arpents sold to Lucas, and on July 9, 1831, executed to the Finneys a deed therefor. When the Finneys purchased they located their eastern line, and erected a fence thereon about one arpent west of the Fry fence, thus leaving an open space of 1x2 arpents between their fence and the line of the Fry fence, which was claimed by Lucas. In 1830 or 1831, the Finneys surveyed their ground and replaced this fence with a more permanent one. In September, 1825, O'Fallon sold twenty-eight arpents, which was supposed to be the entire remainder of his west half of the 2x40 arpents, to one Slater, and the eastern boundary of this tract was also determined by the location of the Fry fence. In 1832, or 1833, the Lindells made a more permanent fence of cedar posts and oak rails, locating it a short distance further west than the original fence. The vacant space between the fences of the Finneys and the Lindells was claimed by J. B. C. Lucas as his property, until his death in 1842, when Washington avenue was opened on the line dividing the Clamorgan and Bissonet tracts, and the fences of the Lindells fell down and gradually disappeared. With the knowledge of the Lindells, Lucas exercised at all times the authority of an owner over this space. He purposely kept it open for his own convenience, as an outlet to the north ; guarded it against trespassers, pastured his cattle upon it, and protected its surface from washing. During all this time the Lindell fence was regarded by all parties as their western line. Lucas acquiesced in its location, adopted the same as his eastern line, and agreed to the location of the Finney's permanent fence one arpent west thereof, as his western line. Valuable improvements

were made by the Finneys on their grounds so located, prior to the opening of Washington avenue in 1842. About this latter date and prior thereto, the Lindells in conversation with the Finneys and others, repeatedly spoke of Lucas as the owner of this vacant space. At the date of the several conveyances above mentioned, these lands were of comparatively little value, and the parties interested were unwilling to undergo the expense of a survey of the entire tract, in order to determine with accuracy the boundaries of the several parts thereof purchased by them. In 1845, however, parties claiming under Clamorgan seized the whole of the land occupied by the Lindells in the Clamorgan tract, and also that claimed by Lucas in said tract, and enclosed the same up to Finney's fence. A full survey was then made by the Lindells of the entire tract of 2x40 arpents, and the tract being longer than was supposed, its center line was found to be, not at the line of the Fry and Lindell fences, but further west and several feet within the Finney enclosure.

The Lindells thereupon asserted title to the whole of the land in the Clamorgan tract from Eleventh street to the Finney fence, which included, of course, the north arpent of the 1x2 arpents claimed by Lucas. The lot in controversy lies on the east side of the north arpent claimed by J. B. C. Lucas, and the plaintiff claims under him. The defendant claims under the Lindells.

The Lindells sued the trespassers, claiming under Clamorgan, in forcible entry and detainer, and recovered judgment against them, and on the 22nd day of October, 1852, were put in possession by the sheriff of all the land lying between Eleventh street and the Finney fence, being about thirteen hundred and fifty feet from east to west. To this suit no one claiming under Lucas was a party. There was testimony tending to show that in the year 1854 the arpent claimed by Lucas in the Clamorgan tract was vacant, unoccupied and unenclosed, and the claimants under Lucas entered upon the same as owner and enclosed the entire arpent, except a small portion on the east side thereof which was marshy and partially covered with water, and held possession of the same for several years. This enclosure covered a portion of the land now in controversy. Conflicting testimony was intro-

duced by the respective parties as to the adverse occupancy of this arpent by the Lindells from the year 1852 until the institution of this suit, the details of which it is unnecessary to state.

In order to show an interruption of the possession relied on by the defendants under their plea of the statute of limitations, the plaintiff offered in evidence the record of an ejectment suit, instituted by the Lindells on the 19th day of February, 1856, against one Hannegan, to recover possession of the Clamorgan arpent, claimed by J. B. C. Lucas, the petition in which suit was sworn to by one of the plaintiffs. In that suit a representative of Lucas was admitted to defend.

At the October term, 1866, of the circuit court of St. Louis county, that suit was dismissed. Some time prior to that date, of course, the Lindells had regained the possession, as the present suit was instituted in 1865. The record was excluded by the court, and the plaintiffs excepted. On the 23rd of October, 1854, the plaintiff sold the property in controversy, and repurchased it in 1859.

The foregoing epitome of the facts will suffice to present the points in controversy. The plaintiff asked the court to give the following instructions, which were given or refused as marked :

No. 1. (Given). " The court instructs the jury that the deeds read in evidence by plaintiff, if true and genuine, vested a title to the land described in the deed of O'Fallon to Lucas in him, said Lucas, to be bounded on the east by Lindell's and the late Jacob Fry ; and it was competent for said parties, or those claiming under them, to locate and fix the line between them without any survey thereof, and without any deed or writing, so as to be binding and conclusive upon them and all deriving title from or claiming under them or either of them."

No. 2. (Refused). " If the jury find from the evidence that about the year 1827 or 1828, said Lindells located their western line at a fence which they put up as their western boundary and John B. C. Lucas assented to said location, and located his land by said fence as his eastern boundary, and both said Lindells and Lucas for a series of years (it might be less than twenty) acquiesced in and considered said location correct, and lived up

to it, and treated it as correct in the uses of their lands respectively, and until Lucas, on the faith thereof, had expended labor or money on said land so located as his, with the knowledge and acquiescence of said Lindells, and until other persons acquiring titles from O'Fallon west of Lucas, located their lands on the faith of the correctness of said western line of Lindells, and expended labor or money on the same, believing these locations correct, such facts, if the jury find them to be facts, constitute in law a valid, conclusive establishment of the said line between said Lucas and Lindells and those claiming under them, anything in the deeds read in evidence to the contrary notwithstanding. And if the jury find the facts to be as set forth above, and that the premises in dispute lie within the tract conveyed by O'Fallon to John B. C. Lucas, and so located by said Lucas and Lindells, then they are instructed that defendants have no defense to this action unless under the statute of limitations."

No. 3. (Given). " The court instructs the jury that defendants can make out no defense under the statute of limitations, unless it has been shown by the evidence that they, and those under whom they claim, have had an actual, exclusive, unbroken and notorious possession of the land in dispute for a whole period of ten years prior to the commencement of this suit and subsequent to February 2nd, 1847."

No. 4. (Refused.) "The Court instructs the jury, if they find from the evidence that prior to October 23, 1854, the plaintiff claiming under the deed to him from Hunt and others, read in evidence, together with Henry L. Patterson and Wm. Fulton, claiming adversely to the Lindells, peaceably entered on the premises in dispute and enclosed the same or part thereof by a fence, Patterson and Fulton, or either of them, acting for themselves and plaintiff, and after said entry and fencing one John Hannegan was peaceably in possession of the land so fenced, as tenant of Patterson and Fulton, or either of them, so acting for plaintiff and themselves, or such as claimed under them ; and said Hannegan, while so in possession denied the right and title of said Lindells, and continued in possession from 1853 and 1854 to some time in 1856, all which said Lindells knew, the jury will

find against the defendants on their plea of limitations as to so much of the premises in dispute as was embraced in said possession of Hannegan. And as to the part not embraced in said Hannegan's possession, they will find against defendants on their plea of limitations, unless it has been shown to the satisfaction of the jury that defendants and those under whom they claim, have had a continuous, actual, notorious, unbroken possession thereof for a period of ten years prior to the commencement of this suit."

No. 5. (Refused.) "The Court instructs the jury if they find from the evidence that prior to October 23d, 1854, the plaintiff claiming under the deed to him from Hunt and others read in evidence, with Henry L. Patterson and Wm. Fulton claiming adversely to Lindell, peaceably entered on the premises in dispute, and enclosed the same or part thereof, by a fence, said Patterson and Fulton, acting for plaintiff and themselves, and after such entry and fencing, one John Hannegan was in peaceable possession of the land so fenced, as tenant of said Patterson and Fulton, or either of them, acting for themselves and plaintiff or such as claimed under him, and at the time of such entry and fencing, neither said Lindells or any one claiming under them, had actual possession of any part of the premises in dispute, and said Hannegan as such tenant so continued in possession from 1854 to some time in 1856, and his possession was adverse to said Lindells, and the jury find that that part of the premises in dispute not in possession of said Hannegan, if any, lay open and vacant in 1856 or 1857, or not in actual possession of defendants or those under whom they claim, they will find against defendants on their plea of limitations."

No. 6. (Given.) "The Court instructs the jury if they find from the evidence that one Patrick Hannegan was about the years 1856, 1857, 1858 or 1859, in peaceable possession of the premises in dispute, or any part thereof, as tenant of Henry L. Patterson, Wm. Fulton or either of them, acting for themselves and plaintiff, or such as claimed under him, and said possession of Patrick Hannegan was exclusive, and adverse to Lindells or those claiming under them, and so continued for several years, and that the part of the premises in dispute not so possessed by Patrick

Hannegan, if any, lay vacant and not in actual possession of Lindells or those claiming under them in 1856, 1857, 1858 or 1859, the defendants cannot avail themselves of their plea of limitation as to said part."

No. 7. (Refused.) "The Court instructs the jury that in order to defeat the plaintiff's action by limitation, the evidence must show to their satisfaction, a continuous, notorious, actual possession in defendants, and those under whom they claim, of the whole premises in dispute for a full period of 10 years, prior to commencement of this suit, and subsequent to February 2, 1847, and no such defense can be made out, if the jury find that during such period of 10 years any interruption of defendant's alleged possession occurred, either by a tenant of plaintiff being in possession adversely to defendants, or those under whom they claim, or by defendants, or those under whom they claim, being out of possession."

No. 8. (Given.) "The Court instructs the jury if they find for plaintiff, he is entitled to recover as damages, the reasonable rents and profits of the premises in dispute, from the commencement of this suit to the time of the verdict; also the monthly value thereof in future, and in addition such reasonable rents and profits, prior to the commencement of the suit during the time, as they shall find defendants have been in possession of, with the knowledge of plaintiff's claim, not to exceed five years before the commencement of the suit."

No. 9. (Refused.) "The plaintiff moves to instruct the jury if Lindells, or those claiming under them, employed a man to watch the grounds under dispute and warn off trespassers, and such man did watch the grounds and warn off trespassers, such facts merely constitute no evidence of possession in Lindells or those claiming under them, the ground in dispute."

The court gave the following instructions for defendants:

No. 10. (Given.) "The deed from O'Fallon to Lucas, October 13, 1824, read in evidence by the plaintiff to the jury on this trial, did not, at the time it was made, and does not now, so operate as to convey to the said Lucas any land situated within the eastern half of the general tract of 2x40 arpents of land, which

did belong to J. Connor, under whom both parties to this suit now claim title; and if the jury find from the evidence that the premises now sued for are situated within the eastern half of said general tract of 2x40 arpents of land, then plaintiff has shown no title to the land sued for, by said deed to Lucas of 1824, or by virtue of any other deed read in evidence in this cause."

No. 11. (Given.) "The deeds and conveyances given in evidence in this case by defendant show a good, legal title in the legal representatives of Peter and J. G. Lindell to all the land within the east half of the general tract of 2x40 arpents of land, which did belong to J. Connor, under whom both parties claim title.

No. 12. (Given.) "If the jury find from the evidence that defendants and those under whom they claim title or possession have had and held open, notorious, continuous and adverse possession of the premises in question now sued for, claiming to own the same for a period of ten years next before the commencement of this suit, the jury will find a verdict for defendants *and so say in their verdict.*"

No. 13. (Given.) "The deeds and conveyances given in evidence by defendants, if they be true and genuine, show a good, legal title in the legal representative of Peter and Jesse G. Lindell, to all land in the east half of the general tract of 2x40 arpents which did belong to Connor, under whom both parties claimed title, which lies west of Eleventh street."

No. 14. (Given.) "If the jury find from the evidence that the agent of Peter and J. G. Lindell was put into possession of the land lying between Eleventh Street and Finney's east fence, and Washington Avenue and Christy Avenue, October 22d, 1852, by virtue of a writ of execution issued in the case of forcible entry and detainer in favor of P. and J. G. Lindell vs. Charles Paynter and others, and said P. and J. G. Lindell, by their agent, received possession of said premises from said sheriff, and continued to exercise acts of ownership over said premises for ten years next after said 22d day of October, 1852, or for ten years continuously next before the day of commencement of this suit; and if the jury further find that no other person besides said P. and J. G. Lindell, their tenants, heirs or devisees, were in

actual possession of the premises sued for in this action within ten years next before the commencement of this suit, then plaintiff cannot recover in this action."

No. 15. (Given.) "In order for the plaintiff to claim the benefit of an estoppel to pass the title of the land of P. and J. G. Lindell, the jury must find from the evidence that the Lindells acquiesced in a boundary line for twenty years prior to the 2d of February, 1847, and for ten years since that date."

There was a verdict and judgment for the defendants, which was affirmed at the general term, and plaintiff has appealed to this court.

It will be seen from the foregoing statement that the plaintiff claims title to the lot in controversy by virtue of an alleged estoppel *in pais* as to the location of the eastern boundary of the 1x2 arpents, originating in favor of J. B. C. Lucas, under whom he claims, and against P. and J G. Lindell, under whom the defendants claim.

This being an action of ejectment, the question which meets us at the threshold of our inquiry is, whether ejectment can in any case be maintained upon a right acquired by estoppel *in pais* in cases of disputed boundary. In other words, does an estoppel *in pais*, in cases of disputed boundary, create a legal or merely an equitable right to the real property affected by it?

Although the general principles by which we are to determine whether an estoppel *in pais* has arisen in any given case are the same, whether the property affected thereby be real or personal, yet, as the statute of frauds has been made the corner stone of every argument against the transfer by estoppel of a legal estate in real property, in determining the question presented it will be proper to exclude from our consideration those cases involving only the title to personal property, and such legal rights and interests as are not required to be evidenced by deed.

Nor will it be necessary to consider any of the numerous cases to be found in the books, affecting real property, which do not relate to the adjustment of disputed boundaries. The rule in cases of disputed boundary is based upon considerations peculiar to those cases.

The authorities are clear to the effect that if one having the legal title to land, induce another to purchase the same from one who has no title, the legal title will not thereby pass to the purchaser, although the legal owner will not be permitted afterwards to assert his title against such purchaser. Where equitable defenses are not allowed in actions at law, the purchaser may have to appeal to a court of equity.

But where one has the legal title to the subject matter of a grant, the location or boundaries of which are doubtful or unascertained, and such person and the proprietor of a coterminous estate mentioned in the grant, establish and maintain their common boundary under such circumstances as will constitute a binding and conclusive identification of the subject matter of the grant, an entirely different case is presented.

In a recent and able opinion by Judge Cooley, (Hayes vs. Livingston, Cent. L. J. vol. 3. p. 692) in which the leading authorities on this subject are reviewed and classified, the doctrine is advanced that the title to real property cannot in any case be passed by estoppel. Reference is there made to the cases in which the doctrine of estoppel has been applied to the voluntary adjustment of boundaries between contiguous estates, and those cases are distinguished by Judge Cooley from the cases cited to support the rule announced by him, on the ground that "it is not supposed that in such cases the title is affected; the parties have only, by their agreement and conduct, determined the limits of their respective ownerships."

We cannot readily accept the foregoing ground of distinction as entirely satisfactory, if, as Judge Cooley seems to concede, such voluntary adjustment of boundary lines is really effectual for the purpose of ascertaining and defining the subject matter of a grant.

While it is true, that in such cases the parties have "by their agreement and conduct, determined the limits of their respective ownerships;" yet it is also true that if the boundary agreed upon is not, in point of fact, the true boundary, the title must, to the extent of the discrepancy between the two, necessarily be affected. That is to say, the limits within which it is operative to confer

a right, will be enlarged or restricted, according to the agreement of the parties. In Baldwin vs. Brown, (16 N. Y. 363) it was. said that "it seems impossible to hold that a mere parol agreement, adopting a line different from that described in the deed, is obli-gatory, without violating the statute of frauds, both in its let-ter and spirit. It is said in some of the cases, by way of sustain-ing the doctrine, that the agreement does not transfer the title, but simply determines the boundaries of the land described ; a distinction, the soundness of which may well be doubted. The supposition of such an agreement, in cases of long acquiesence in an established line, is as I apprehend, entirely superfluous. The acquiescence in such cases affords ground, not merely for an infer-ence of fact to go to the jury as evidence of an original parol agreement, but for a direct legal inference as to the true boundary line. It is held to be proof of so conclusive a nature, that the party is precluded from offering any evidence to the contrary."

In this case it is quite apparent that a legal fiction is invoked, which practically extends the title to the established line, and at the same time avoids the intervention of the statute of frauds, which it is supposed would otherwise prevent such extension of the title. The necessary consequence however, of both of these decisions, which on this point are representative and not excep-tional cases, is that the title conveyed extends to all the land in-cluded within the boundaries ascertained and fixed by the agree-ment of the parties in the one case, and by location and acquies-cence in the other. If the boundary so fixed is to be conclusively regarded as the true boundary, of course the legal title must cover all the land within such boundary. (Vasberg vs. Teater, 32 N. Y. 568.)

This question was thoroughly examined by this court many years ago (Taylor vs. Zepp, 14 Mo. 482 ; Blair vs. Smith, 16 Mo. 273), and the conclusion was then reached, both upon princi-ple and authority, that when the proprietors of contiguous estates, the boundaries of which are indefinite and unascertained, agree upon the line dividing their estates, the calls in their respective deeds, fasten themselves upon the property to which they are thus applied, and the title passed by the conveyances covers and in-

cludes every part of the property so identified as being comprehended within the description contained in the grant.

In the case of Taylor vs. Zepp, *supra*, as in the case at bar, the boundary was not fixed in the deed by monuments, courses and distances, and a boundary fixed by the agreement and acts of the parties was held to be conclusive.    Judge Napton, who delivered the opinion of the court, used the following language : "It is said that this doctrine conflicts with the statute of frauds, but it has not been so regarded in any of the numerous cases decided on this point.    Where the terms of the deed are ambiguous, there is clearly no ground upon which the statute of frauds can be invoked ; but even where a well defined boundary is given in the deed, we have seen that a different one may be established under circumstances which will conclude the parties from contesting it.    This is only analogous to numerous other doctrines, as well settled as the construction of the statute itself.    Is not a title itself held to pass by estoppel ? Have not the courts refused to permit the contents of a deed to be proved, when the grantee has destroyed it with a view to reinvest the title ? *Have not the owners of land transferred their title by standing by and permitting adverse possession, and the adverse proprietors to build and improve ?* The statute was made to prevent fraud, and the courts have not felt themselves called upon to adhere so closely to its letter as to facilitate and encourage the very evil it was framed to prevent.    *The truth is, the statute does not apply to such cases.* The doctrine of estoppel is as old as the statute of frauds, and, as such, a part of the law of the land.    It is no objection to either, that the one may be a modification or regulation (?) of the other."

In the case of Blair vs. Smith, *supra*, the rule laid down in Taylor vs. Zepp was followed and approved, and the following language was employed in giving expression to the opinions of the court : "The statute of frauds does not touch such a case as this.    *Here there is no sale of land to either party.    There is no consideration passing from one to the other ; it is not a contract either of buying or selling land from one to the other.* They own adjacent lots—contiguous lots; they agree

that such a marked line shall be the dividing line between the lots which they own ; and they use and occupy the respective lots up to this line, not for twenty years, not for fifteen years, but for a length of time sufficient to show the understanding and the intention of themselves—to show that they know their own boundary, that they are content with their own boundary. * * *

"Now, this use and occupancy without disturbance, for a time, long enough for men to show that they know the boundary between their lands, shall be considered binding and conclusive as to such boundaries, as well as of such understanding or agreement between them.

"They shall not, after a lapse of years, longer or shorter, as the circumstances may tend to show their agreement or settlement or the fixing of their common boundary, be permitted afterwards to dispute it. *Such boundary, thus agreed upon shall be considered the true one ; and each one considered as the owner of the land mentioned in his deed thus marked out to that boundary between them:*" See, also, Boyd vs. Grayes, 4 Wheat. 513 ; Heirs of Hunton vs. Mathews, 1 Yerger, 118 ; Lewellen vs. Overton, 9 Humph. 76, which assert the same doctrine.

The reason of the rule thus established must, of course, confine its operation to cases of disputed or uncertain boundary. In all cases where the location of the true boundary is known to the proprietors of coterminous estates, and they attempt for mutual convenience or other sufficient reason to transfer land from one to the other by a parol agreement, changing the location of such boundary, the statute of frauds will inflexibly apply. (Nichols vs. Lyttle, 4 Yerger, 456 ; Gilchrist vs. McGee, 9 Yerger, 455 ; Garborough vs. Abernathy, 1 Meigs, 413 ; Vasberg vs. Teater, 32 N. Y. 568.)

We do not hesitate to hold, therefore, that where a disputed or uncertain boundary line has been conclusively settled by parol agreement, ejectment may be maintained for all the land included within the call of the deed, as located and determined by the agreement and conduct of the parties fixing the boundary ; and it

has been so held in the case of Speers vs. Walker, 1 Head, (Tenn.) 166; Tarrant vs. Terry, 1 Bay (So. Car.) 239.

The question next to be considered is whether there was any testimony from which the jury would have been authorized to find or infer the existence of an agreement between Lucas and the Lindells, establishing their common boundary at the line of the Fry and Lindell fences. There can be no question, we think, but that the boundaries called for in the conveyances were of that nature that they might properly be made the subject of voluntary adjustment by the parties.

As stated in Taylor vs. Zepp, *supra*, it has been held that they may be so adjusted even when the boundary is defined in the deed by courses and distances. Lucas and the Lindells were all dead when this cause was tried, and no testimony was introduced to show any *express agreement* between the parties as to their common boundary. But there can be no controversy about the fact that the Lindells did in 1828 or 1829 erect a fence on what they supposed to be their western line. Nor can there be any controversy about the fact that Lucas, regarding this location made by the Lindells to be correct, acquiesced in the same, and agreed to the survey made by the Finneys in 1832–3, and the location of their permanent fence made in accordance therewith, fixing their eastern and his western line. The further fact is not disputed, that the area originally left between the Finney fence and the Lindells, was slightly in excess of the arpent, and that when the Lindells erected their permanent fence in 1832–3, they located it a few feet west of the fence first erected by them, thereby reducing the open space between their fence and the Finney fence to one arpent in width, the amount claimed by Lucas. It is not denied that Lucas, from the date of his deed, in 1824, to the day of his death, in 1842, with the knowledge of the Lindells, exercised acts of ownership over this vacant space, and claimed it as his own. He protected it against trespassers, pastured his cattle upon it, improved its surface, and paid taxes upon it. And there was evidence to the effect that one of the Lindells being upon the land, declared Lucas to be the owner of it, and

stated that he had tried to buy it, but could not. Lucas kept this ground vacant as a "look-out" to the north, and as a means of egress northward to the St. Charles road from his residence, which was immediately south of it. It is not denied that the Lindells, prior to their discovery, in 1845, that the line of their western fence was not in fact the true line, constantly recognized this arpent to be the property of Lucas, and did, on various occasions, and to various persons, so declare themselves.

It is strenuously contended, however, on behalf of the defendant, that as the location of the Lindells' west line was made by them in ignorance of their true boundary, they were not guilty of any fraud, concealment, or willful misrepresentation, intended to deceive Lucas, and by which he was deceived and misled to his injury, and that therefore they are not estopped from claiming to their true line.

This is not a case involving the general doctrine of estoppel, so ably and learnedly discussed by the distinguished counsel for the defendant, and if it were, we should be disposed to take issue with his statement of the law on that subject. The rigid rule laid down in Pickard vs. Sears, 6 Ad. & El. 469 ; Boggs vs. Merced Mining Company, 14 Cal. 279, and kindred cases, has been somewhat qualified by more recent adjudications. But the question here is, whether the testimony relating to the practical location of the boundary lines between Lucas and the Lindells, in 1828 or 1829, and their acquiescence in the same for a period of nearly seventeen years, together with the declarations and conduct of the parties in reference thereto, was sufficient to warrant the jury in inferring therefrom an agreement between the parties establishing such line. We think it was.

In Rockwell vs. Adams, (7 Cowen, 761) Sutherland J., said : " Now I apprehend that it is not necessary, in order to make an actual practical location control the courses and distances in a deed, that the party making such location, or subsequently recognizing it, should in all cases know that the effect of it would be to give him less land than he would otherwise be entitled to, nor that there should be an *express agreement* to abide by such line. An acquiescence for a length of time is evidence of such

agreement. When the line has been acquiesced in for a great number of years by all the parties interested, it is conclusive evidence of an agreement to that line."

In Baldwin vs. Brown, (16 N. Y. *supra*) it was held that such acquiescence was conclusive evidence, not of an agreement, but that the boundary fixed was the true boundary. This, as we have before seen, was upon the theory that no valid parol agreement could be made in such cases—a doctrine which does not obtain in this State.

In Dibble vs. Rogers, (13 Wend. 539,) referring to the charge of the judge to the jury in the trial court, it was said: "He instructed them that a long acquiescence in an erroneous location by the plaintiff, would authorize them to find that the plaintiff had agreed to a location different from that given by his deed; and whether he knew his rights or not, such location or acquiescence would conclude him; and if the jury were satisfied that the plaintiff had agreed to such a location, (of which his long acquiescence in the location contended for by the defendant was evidence) that they would find for the defendants, otherwise for the plaintiff. This is the rule of law laid down by this court in Rockwell vs. Adams, (7 Cowen, 762;) and again, after a second argument, in the same case in 6 Wend. 467. It is believed that the authorities referred to in those cases fully sustain the principle. (See 1 Caines, 363; 3 Johns. R. 8, 269; 7 Id. 245 per Van Ness J.; 8 Id. 367; 9 Id. 100; 17 Id. 29.) It has again been recognized in the recent case of McCormick vs. Barnum, 10 Wend. 104; and in Kepp vs. Norton, 12 Wend. 130. The acquiescence in those cases varied from the period of 17 to 40 years. In this case it was about twenty years. Those cases also show that the *acts* and *declarations* of the parties are competent evidence upon the question of location."

In Jackson vs. McConnel, (19 Wend. 176,) it was held that acquiescence was evidence of an agreement, but not conclusive evidence unless continued for a great number of years. The rule announced in the foregoing cases was approved in Blair vs. Smith, *supra*, and Taylor vs. Zepp, *supra*.

It follows from the foregoing authorities, that defendants' instructions number 10, 11, 13 and 15, should not have been given. Plaintiffs' instruction number 2 needs some modification to make it conform to the views expressed in this opinion.

We will now proceed to consider the action of the court below in giving and refusing instructions on the subject of adverse possession. If it be considered that there was a binding and conclusive establishment of the boundary line between Lucas and the Lindells, the effect of which was to apply the calls in Lucas' deed to the property in controversy, it is clear that when the trespassers claiming under Clamorgan took possession of the land between Lindell's and Finney's fence, as to that land Lucas was disseized and not the Lindells.

A recovery by the Lindells in the action of forcible entry and detainer against the trespassers, could not of itself affect Lucas' title to this arpent. No such effect is claimed for the judgment in that case. But it is very confidently asserted that the judgment rendered therein when executed by a writ of *habere facias possessionem* in 1852 related to the institution of the suit in 1845, and by operation of law made the possession of the trespassers during the intervening time the possession of the Lindells.

We are not prepared to admit that the doctrine of relation can be invoked under such circumstances, for the purpose of creating a constructive, adverse possession.

But it is wholly immaterial in view of the testimony on the subject, whether the adverse possession of the Lindells is dated from the time when they took possession under the writ of execution in 1852, or from the institution of the suit in 1845. In order to divest the title of Lucas, the Lindells must have had ten years' continuous, adverse possession after February 2d, 1847, the date of the act fixing a limitation of ten years in action for real property, and before the 7th day of January, 1865, the date when the present suit was instituted. If the jury should believe the testimony tending to show that the claimants under Lucas were in possession during the years 1854, 1855 and 1856, or that the claimants under the Lindells were during said years out

Turner v Baker, et al.

of possession, and the premises were open and vacant, the defense of the statute of limitations must necessarily fail.

Unless the defendants, or those under whom they claim, were in possession in the year 1856, it is arithmetically impossible that there could be a continuous, adverse possession for ten years, between the 2d day of February, 1847, and the 7th day of January, 1865. If the premises were vacant, the constructive possession would of course follow the true title ; and if by an agreement between Lucas and the Lindells, fixing the boundary line, the title was in Lucas' representatives; and such title had not been divested by ten years' adverse possession, then the constructive possession, while the premises were so vacant, was in them. So that when the Lindells regained the possession, before the institution of the present suit, they could not claim, as any portion of their adverse occupancy, that period during which the representatives of Lucas were in the actual or constructive possession of the premises sued for.

We are of the opinion, therefore, that the fourth and fifth instructions asked by the plaintiff, and refused by the court, should have been given. The seventh instruction had been substantially given in the third. Defendant's instruction numbered fourteen was defective in leaving it to the jury to determine what acts of ownership will amount to adverse possession.

In regard to the record of the ejectment suit instituted by the Lindells in 1856, which was offered in evidence and was rejected by the court, we are of the opinion that it should have been admitted especially in view of the testimony that Hannegan, the defendant therein, had entered and was holding under the representatives of Lucas.

The petition in that case being sworn to under the law then in force, by one of the Lindells, amounted to a solemn admission that the Lindells were at that time out of possession. It necessarily follows, that the judgment of the circuit court, both at general and special term, must be reversed and the cause remanded for a new trial.

Judges Napton and Sherwood concur. Judges Norton and Henry were not on the bench when this case was argued.